Ranney J.
Two questions, arising upon papers filed since this case was reserved, must be disposed of, before the merits of the case, as it then stood, can be considered. These questions are both addressed to the sound discretion of the court, and in the exercise of such discretion, we have arrived at a conclusion upon them.
■ 1. The plaintiff now moves the court for leave to dismiss the action. This motion is resisted by the defendants, upon the ground, that the answers in the case, are, in substance and legal effect, cross-petitions, calling for affirmative action in their behalf. We think this position well taken. In Hill v. Butler, 6 Ohio St. Rep. 216, it was held, that however unskillfully or inartifieially an answer may be drawn, yet if it contain facts, which in substance amount to a counterclaim,, the court will not permit the defendant to be prejudiced, and will give such affirmative relief as the facts will warrant.
The answer of the trustees of the Congregational Church is made up mostly of a recital of the proceedings of the member» of that church, at meetings convened for the purpose of considering the matters involved in this action ; and gives a copy of a resolution adopted on the 23rd of May, 1859, in these words: — “ Besolved, That the trustees be instructed to enter their appearance in the court of common pleas, in the suit brought by Wm. Wiswell, Jr., against them and others, and ask that court to give judicial sanction to, and to direct the-trusts of the charter to le carried out ly, such sale and division.”
The answer of Robert Hosea, who was admitted to defend for himself and others, described as being about one half the-members of the .church, and one half of the pew owners, is *34 equally explicit, and prays, “ that the sale take place, and the proceeds be distributed in manner stated in the answer and cross-petition of the trustees.”
For reasons hereafter stated, the court is of the opinion, that the answer of the trustees contains matter proper for a ■cross-petition, and we can not understand 'them as asking for less than they were expressly instructed to ask, by those they represented.
As we -do not understand the plaintiff to desire to dismiss his petition unless the whole case is* thereby disposed of, we ■overrule this motion.
2. In the event which has happened, that the motion to dismiss does not prevail, counsel for the plaintiff, who for this purpose represents the present trustees of the church, ask leave to file a supplemental answer, stating in substance, that on the 26th day of May, 1862, at an extra meeting of the church, all previous resolutions for a sale and division of the ■church property, were repealed, and the trustees were instructed to take such measures in relation to the proceedings in court as in their opinion the circumstances might require, in view of this fact. And that the trustees, on the 16th day of February, 1863, adopted a resolution directing them attorney to withdraw their answer, and to disclaim for them any wish to have the property sold.
In answer to this application, sundry affidavits are filed on behalf of those members of the church represented by the answer of‘Robert Hosea, by which it is made very apparent that ■these resolutions were adopted only by one of the parties into ■ which the membership of the church is unfortunately divided, ■to whom the organization had been yielded in the faith of previous arrangements, and who were then in the possession and ■use of the entire church property. The notice only stated that the meeting was convened “for the transaction of business,” and there was nothing to indicate that these extraordinary proceedings were to be had. Indeed, the unfairness of the proceedings, is made still more manifest by the affidavit •of Mr. Kebler. He states that he and another member, belonging to the other division of the church, which had then *35 taken the name of the Church of the Redeemer, saw the notice and attended the meeting, and on making inquiry of the plaintiff whether the business to be transacted concerned only that division of the church which afterward adopted these resolutions, and which had then taken the name of the Eree Church, they were informed by him, “ that the sole object was to transact business of interest to their section of the old church, and to raise funds for Mr. Conway’s support and none other ; that we need not remain and would find nothing to interest and concern us, unless we wanted to help along the subscription; ” and that they thereupon left the meeting. No other member of the Church of the Redeemer was present at the meeting, and but a part only of the members of the Eree Church.
These affidavits also show a state of facts, of which we make no account either in this or any other part of this opinion, viz: that the members composing the Church of the Redeemer, relying upon the previous resolutions of the corporation, and before any attempt was made to rescind them, had incurred heavy responsibilities in providing another house of worship. Whether they had thereby acquired such vested rights to a portion of the property of the old church as may be enforced, we neither intend to deny nor affirm; there being nothing in thd case reserved to this court t© require an opinion upon that subject.
Noav, it will be readily conceded, that before a party can be permitted to change the pleadings made up in the court below, after a case comes into this court by reservation, he must make it very apparent that his rights will be sacrificed without it, or that plain injustice will be done him.
This case was reserved at the October term, 1860, of the district court, and at that time an agreed statement of facts was filed, which it was stipulated should thereafter be conceded as the fqcts of the case, and upon which it should be decided. To allow a change of the pleadings now, is to permit this agreement to be violated, new issues to be formed, and other evidence made necessary.' And to what end? Simply that a majority of one party to a church controversy, after removing ■opposition by concessions, may be able to defeat all the ex *36 pectations and calculations which its own previous conduct had inspired. If we were obliged to yield to such an application, as we might be, if we had undoubted evidence that such was the wish of a majority of the members of this corporation, we should do so with reluctance. But we have no such evidence ; on the contrary, we are clearly convinced that no fair or legal opportunity has been afforded them for that purpose. The corporation is the party to this action; and by the express terms of its charter, it holds the property in question in trust for the church, and subject to sale only upon the consent of a majority of the members “legally assembled.” The answer filed in the court below, is the answer of the corporation as well as its trustees, and in it the corporation rightfully calls upon the court to define its powers in respect to the property held by it in trust, and to approve, if we legally may, its -proposed disposition of it. This call has been legally made, and before we can consider it withdrawn, it must at least appear that those who made it, have receded from their position.
3. A brief statement of the facts is necessary to a clear understanding of the questions arising upon the merits of the controversy. ■ The church was incorporated by an act of the ■ general assembly, passed January 21, 1830. In all its features, as its name imports, it was made a Congregational Church, and subject to the control of a majority of its members. Consistently with its charter, it might have adopted almost any form of Christian faith and worship. It did'adopt that known as the Unitarian. Its power to acquire, hold, and dispose of property, is expressed in the third section of the charter, as follows:
“ Sec. 3. That the said corporation, by the name aforesaid, shall be capable, in law, of having, receiving, acquiring and holding, either by gift, grant, devise, or purchase, any estate, real, personal or mixed, which may become the property of the corporation: Provided, that the clear or net annual income of all such property (independent of their house of worship and the parsonage house) shall not exceed the sum of four thousand dollars; and provided also, that all such property, with the house of worship and the parsonage house, shall be considered *37 as held in trust, under the management and at the disposal of said corporation, for the purpose of promoting the interest of their church, defraying the expenses incident to their mode of worship, and maintaining any institutions of charity or education that may be therewith connected; provided, moreover, that when money or other property shall be given, granted, bequeathed, or devised to said corporation for any particular end or purpose, it shall be faithfully applied to such purpose.” A proviso to the eighth section, restricts the power of the trustees in these words : “ Provided, always, that they shall make no by-laws or pass any order for the imposition of any tax, or the sale of any property, on account of the corporation, unless by the consent of said corporation, expressed by a majority of the members present, legally assembled.”
All the property now in question, was acquired by the corporation absolutely, and subject to no limitations or trusts except those expressed in the charter.
The controversy in the church, out of which this suit has grown, arose in 1859, and originated in the dissatisfaction of about one half the members of the church, with the preaching of the Rev. Mr. Conway, the settled pastor. Who was in the right, and who wrong, at this stage of the proceedings, is unknown to. us, nor is it material to inquire. On the 21st of March, a meeting of pew owners and pew renters, was called to consider the question of the further retention of Mr. Conway, as pastor; and upon this question being put, a scene of parliamentary skirmishing ensued upon preliminary questions, which in secular bodies would have indicated a doubt with each of the parties, which was likely to succeed upon the main question. That question, however, was left undecided, and the meeting adjourned to the 30th of the month; when, instead of acting upon that question, the meeting (pew owners alone voting), by a vote of twenty-seven to nine, adopted the unpleasant declaration, that the society was so divided in sentiment, that the members could no longer work and worship together as one harmonious whole; and appointed a committee to draft a just plan for a division of the church property,'with instructions to report at the annual meeting to be held on the 4th,of April. *38 At the annual meeting this committee reported, that it would be advisable to dispose of the church property and divide the proceeds in the proportion of the interest of the pew owners, to be used for the purpose of establishing two churches, if this could be legally done; but as doubts had arisen upon that point, they asked further instructions. Whereupon the subject was re-committed to them with authority to take legal advice, and the meeting adjourned to the 11th of that month. At this adjourned meeting, the committee presented the legal opinion of five gentlemen of the bar, a majority of whom belonged to the respective divisions in the church, to the effect, that, a majority of the members of the corporation consenting, the property might be legally sold, and a portion of the proceeds paid over to a new religious society to be formed of a portion of the members of this, to be held by them in trust for like purposes. And, thereupon, the meeting (pew owners alone voting) adopted the following resolutions — the first by a vote of twenty-eight to one, and the second by a vote of seventeen to eight.
“Resolved, That Messrs. Greene, Carlisle, Goodman and Peters, be appointed a committee with power to sell the church real estate at private sale or public auction, or to lease the same perpetually, at their discretion, and that the trustees convey the same by deed of general warranty, when sold, or if leased, that they execute the necessary lease.
“Resolved, That the trustees, after paying the debts of the church, transfer and hand over to a new board of trustees of a new religious society, to be formed by part of the members of this, such a proportionate part of the proceeds of said church property as fairly may belong to such members forming a new church, reckoning according to the valuation of the pews, including sums now standing to the credit of parties which are not represented by pews.”
The meeting, then, after directing by a unanimous vote a like disposition of the personal property of the church, still further adjourned to the 25th of that month; at which time no sale or lease of the property having been made, the committee was directed to advertise it for sale at auction on the *39 16th of May, to which time the meeting again adjourned. At the meeting of the 16th of May, the committee reported the injunction allowed in this action, restraining further proceedings in the sale of the property; and the meeting adjourned to the 23rd of May ; at which time, all signers of the constitution and by-laws, and all pew owners being allowed to vote, the following preamble and resolutions were adopted by a vote of forty-six to eighteen. Mr. Hosea protesting because others than pew owners were made voters, and Mr. Wiswell against the legality of all that had been done.
“Whereas, it is for the interest of this church that its property should be sold, and the proceeds distributed to the two .bodies into which the membership is divided, if' the same can be legally done—
1. “ Resolved, That we consent to a sale of the real estate of the church upon the following terms: one fourth cash, balance in one, two and three years, with interest from the day of sale, payable annually, the deferred payments jo be secured by mortgage on the premises: the proceeds to be equally divided be-this church and the Church of the Redeemer.”
2. “ Resolved, That the trustees be instructed to enter their appearance in the court of common pleas, in the suit brought by William Wiswell against them and others, and ask that court to give judicial sanction to, and to direct the trusts of the charter to be carried out, by such sale and division.”
3. “ Resolved, That the pastor of this church be requested.to offer the use of the church property, for one half the time until the legality of such sale and division is finally adjudicated, .to the Church of the Redeemer, the details of such use to be adjusted by him and the pastor or trustees of that body.”
We have thus, at the hazard of being accused of undue prolixity, made a detailed statement of these proceedings from beginning to end, and it only remains for us to say, that they seem to have been taken with the utmost fairness, deliberation and candor, throughout. We see nothing in them but an honest effort of Christian men and women, tenacious of their rights of conscience and religious belief, to do justice by each other, in the unavoidable separation which was about to ensue. Whether *40 they had the legal power to do what they have attempted, is quite another matter, and must be settled upon its own merits; but it is enough rare to find such controversies tempered with, liberality and justice, to justify an emphatic approval when they appear. Even in a legal point of view, we must take it to have been conclusively settled by the members of this corporation, that the members of the society were so divided in sentiment that they could no longer work and worship together ; and that they honestly believed the proposed sale and division of the church property, would promote the interests of their church.
We agree entirely with the plaintiff’s counsel, that the whole scheme proposed, must stand or fall together, and that all the property held by the corporation, is conclusively bound by the trusts expressed in the charter. It follows, of course, that there can be no sale unless the proposed application of the proceeds is legal; and that the plaintiff, as a member of the corporation, has the undoubted right to prevent, by injunction, the corporation or a majority of its members, from committing a breach of trust. This is one of the oldest and most important heads of equity jurisdiction, and the vast multiplication of corporations in our times, but gives additional reasons for maintaining it in its full integrity.
With these general principles in view, we are prepared to consider the specific objections made to these proceedings.
It is first insisted that no sufficient notice of the meetings at which these resolutions were adopted, was given to the members of the corporation. A conclusive answer to this objection, is, that they were all adopted at the annual meeting, when it was entirely competent to transact this, or any other lawful business. It is true, they were adopted at adjourned sessions ot that meeting. But it is perfectly settled that such adjournments are but a prolongation of the annual meeting. 11 Vermont Rep. 391; 4 Exchequer, 850; 9 Ohio. St. Rep. 479, Bryant v. Goodwin. In point of fact, a special notice was given for the meeting of the 23d of May, which states that it was convened “for the purpose of considering the propriety of selling the real estate of the corporation, and for other purposes. *41 We have no doubt of the sufficiency of this notice for an extra ■meeting, under the seventh section ^ f the charter. The rea sons Tor the sale, and what was to be done with the proceeds, would be the natural inquiries made by any one interested in the matter.
It is next objected that persons entitled to vote were excluded, at all the meetings of the corporation prior to that of the 23d of May, and that it can not, therefore, be ascertained that a majority of the members of the corporation consented to -the sale. We think this position well taken, and that, for this reason, the injunction was properly granted. The' fifth and .sixth sections of the charter provide:
“ Sec. 5. All elections shall be by ballot, and determined by a majority of votes, each member of the corporation being entitled to one vote in this as in all other matters touching the interests of the corporation.
“ Sec. 6. That an owner of a single pew in the ho$se of worship, shall be entitled to all the privileges of membe^ip.”
It seems to have been supposed that a proper construction of the sixth section, restricted the right of voting to pew owners. This was a grave error. That section, instead of restricting the voting power of the corporation, was intended to enlarge it, by extending “the privileges of membership” to those who might own pews in the house of worship, although not otherwise connected with the church or corporation. Fairly construed, it gave to such persons the same rights in this respect, as were secured to the members of the corporation by the fifth section, and the corporation rightly interpreted its charter, when, in 1855, it provided that all who signed the constitution should become members. To provide that a member should have the “privileges of membership ” would be little less than absurd; but to extend to one not a member, the rights secured to a member would be entirely consistent, and might be very expedient and necessary.
By the fourth section, the first election of trustees was to be made on the second Monday of February, 1830. Upon the construction contended for, there would then have been no voters, unless, without organization, between the passage of *42 the act on the. 21st' of January and that time, the corporation had built a house of worship and sold the pews; and should it hereafter resolve to make the seats free, it would thereby destroy its capacity for maintaining its organization in the future.
The persons named in the act of incorporation had the right to ehoose and admit their associates, and this right, in perpetual succession, belongs to a majority of those who, at any time, constitute the membership of the church; and while they may at pleasure receive or reject whomsoever they please, they can not deprive one received into the society of the right to vote “in all matters touching the interests of the corporation.” Robertson v. Bullions, 1 Kern. 247; Wyatt v. Benson, 28 Barb. 327; Milford, etc. Turnpike Company v. Brush, 10 Ohio Rep. 113.
Thjs objection, however, does not apply to the resolutions adopted at the meeting of the 23d of May, at which • all who coul||iay. any claim to the right, were admitted and did vote. But it is objected that this was done after the suit was commenced’and the injunction allowed; and it is insisted, that these proceedings can neither be used as a defense to the action, nor as a foundation for affirmative relief. We are of a different opinion. A moment’s attention to the nature of the action, and the character of the relief sought by the petition, will place this matter .in a clear light. No right of the plaintiff for which he demanded reparation in damages or otherwise, had yet been invaded; but because he did, and had reason to fear there would be, he asked an injunction. The remedy sought was purely preventive-, and in such cases, it is perfectly well settled that a court of equity will not continue or make perpetual, an injunction, after the cause upon which it was granted has been removed, and the danger of invading the rights of the plaintiff no longer exists. The wffiole is then reduced to a mere question of costs.
The plaintiff truthfully asserted in his petition, that the members of the corporation, had not then given their consent to the sale and division; but when they did afterward give their consent, in the mode prescribed in the charter, this no longer *43 constituted an objection to tbe future action of the corporation. A proposed sale and division of the property, is the “ transaction” set forth in the petiticn “as the foundation of the-plaintiff’s claim;” and directly “connected” with this “subject of the action,” is the counter dam of the defendants, setting-forth what they have done, and what they propose to do, and demanding the judgment of the court upon the legality of their acts. It is difficult to conceive of subjects more intimately blended, and when it is remembered that the parties are all either trustees or cestui que-trusts, there seems no occasion for an attempt to divide, what in its nature is indivisible'. By the terms of the charter, this corporation is expressly made the trustee of this property for the church, and we do not deem it important-to consider whether the judgment asked upon the counterclaim, is more properly demandable under the provisions of the act of 1853 (1 S. & C. 371), or stands upon the-general doctrine in equity, which allows a trustee, in honest doubt as to his powers, to apply to a court of equity to define them, and give judicial sanction to his acts. It may well rest upon either; but neither will authorize us to go further than to define the trusts upon which the property is held, and to-sanction and authorize what is proposed to be done. No adverse right is asserted to this property, which would authorize us to order a sale; we can only restrain the illegal acts of the-corporation, or authorize and sanction the performance of those which are legal.
And this brings us to the direct question, does the charter allow the proposed sale and division? That the corporation, with the consent and approval of a majority of the members, may sell the property, is not doubted. This is incident to every corporation, unless expressly restrained, and by this charter is clearly and distinctly allowed. But does the proposed application of a part of the proceeds, fall within the-trusts expressed in the charter ? This question is not without difficulty, and'we have endeavored to bestow upon it very careful attention. 'The argument is, that the dissatisfied members to whom it is to be paid, are simply seceders from the old organization ; and the well-settled doctrine is invoked, that they *44 have thereby forfeited all right to any part of the church property. Trustees of the Presbyterian Congregation of Fairview v. Sturgeon, 9 Penn. St. Rep. 321, 322; Ibid. 329, 330; Attorney General v. Sutton, Drury, 520, 521; Smith v. Smith, 3 DeSaussure, 557; Ibid. 582, 583, 584.
Nor is it material whether the seceders were a majority or a minority of the old organization. They left it; and that is •enough. Baker v. Fales, 16 Mass. 503, 504; Den v. Bolton, 7 Halsted, 214, 215; Cammeyer v. Corporation of the United German Lutheran Churches, 2 Sandf. Ch. Rep. 214.
Where dissensions have arisen, and schism follows, although it be decided, judicially, that there is no intelligible difference in doctrine or opinion, those who adhere to the old organization are entitled to its property in exclusion of all others Craigdallie v. Aikman, 2 Bligh, 529; Same Case, on former appeal, 1 Dow’s Pari. Cas. 15, 16; Foley v. Wontner, 2 Jac. & Walk. 247. See, also, Field v. Field, 9 Wend. 394.
But with these doctrines distinctly admitted and approved, it must be conceded that no one of the authorities cited, presents the case of a separation by the consent and approval of the old organization. The question here is not, what may those who go out demand, but what may the old organization lawfully concede. That both the parties to the controversy in the church, were lawful members of the corporation, is undoubted. When and how did one of these parties become seceders ? Not certainly, by differing “ widely” with Mr. Conway “in his views of Christian truth.” The very fundamental idea upon which the church was founded, not only allowed, but •encouraged such freedom of thought, action and belief; as was said by this court in a similar case: “ It does not follow, that they lose their property by ceasing to entertain certain opinions. The declaration of faith under which they were organized, contains no attempt to bind them to abide in the same belief. * * * The opinions of such a body can not but change. To fix their fleeting wherries; to anchor them immovably in the stream of time, is beyond human power; for the mind at least is free; ranging by its inherent strength ■through the boundless fields of knowledge, molding its belief *45 according to its apprehension of the truth, and incapable of fixedness, until the day when all truth shall be made known. And if it were possible, it were wrong; to limit activity of mind, is to set boundaries to human knowledge.” Keyser v. Stensifer, 6 Ohio Rep. 363.
It was certainly the legal right of both these contending, parties to remain together, and strive for the mastery, until one or the other had triumphed, and the majority had adopted such a form of faith and teachiug, as to make it morally impossible that the minority should remain; and in such case, there is no doubt they must go out naked. But was this also-a legal necessity ? Or might they not, sensible that strife and contention were destructive of their influence for good, and acting upon those principles of morality, justice and moderation which so essentially adorn the Christian character, honestly decide that a separation in peace, with such an equitable division of the common property as would enable each to enter upon a career of usefulness, would promote the best interests of their entire church?
No ease like the present is cited in argument, nor has any fallen under our observation; but the elementary writers, Angelí and Ames, after stating the general principle that those who secede are entitled to no part of the corporate property, add as an unquestionable limitation upon the rule — “ unless indeed there be an agreement made for the partition of it.” A. & A. on Corp. sec. 194. And .it is certain that judges of the highest eminence have strongly recommended that course. Oh. J. Gibson, at the close of his opinion in Methodist Church v. Remington, 1 Watts, 227, says : “ It certainly would conduce no less to the temporal than to the spiritual comfort of the parties, were they to part in peace, having, settled their respective claims to the property on the basis of mutual and liberal concession.” And in Presbyterian Congregation v. Johnson, 1 W. & S. 40, the same distinguished judge, in answer to the inquiry, where the minority were to look for redress, says, the appeal being “to the justice and forbearance of the majority of the association, whose very object is to deal justly, love mercy, and walk humbly, it is to be supposed that *46 the minority can not appeal in vain.” See also, 1 Spear. Eq. R. 90 ; 23 Barb. 337; 2 Wend. R. 135; 2 Sand. Oby. R. 188. 'These opinions, it is true, are not authority; but it strikes us as somewhat singular, if the thing could not legally be done, that these eminent jurists should have so often persisted in re•commending breaches of trust.
Whether there has been a secession is a mixed question of .law and fact, to be decided upon the evidence with a view to all the circumstances, including the acts of the parties and the motives which have prompted such acts. Wekerly v. Leyer, 11 Serg. & R. 38; Baptist Church v. Rouse, 21 Conn. 166.
Upon a careful review of all the evidence, we are clearly of .the opinion that none of these parties have lost their membership in the corporation, but are still entitled to all the rights -.and privileges of that position. So far from their having .abandoned the exercise of these rights, the record shows them present at all the meetings, and voting without question from any one ; and the very house of worship has been, by mutual agreement, occupied by each of the parties. Undoubtedly, there has been a provisional separation, founded upon the consent of a majority of the corporation, that the property should be equally divided. But while this remains unexecuted, neither party can be permitted to take advantage of .that fact.
That the property acquired by this corporation, can not be converted to the private use of its members, nor otherwise diverted from the uses expressed in the charter, is a proposition •too clear to need argument or illustration. But the question is, what are the uses allowed by the charter ? One of them, and as we hold wholly unaffected by the other purposes ex■pressed, allows the corporation to dispose of the property “for the purpose of promoting the interest of their church.” These are very broad words. The artificial being created by law is a simple trustee for the collective membership of the church. Whatever will best promote the interest of this membershipj considered as such, is within the terms, and, we think, within the spii’it of the grant. It was no part of the object for which this corparation was created, to enable it to accumulate *47 wealth. Indeed, beyond a very limited amount, it was expressly prohibited from doing so. Looking to the leading purpose of the association, it is not difficult to see that the interest of this membership is best promoted by securing to it that spiritual peace and harmony within, and that salutary influence without, which will enable a sinful world to see, that they “ dwell together in unity.” It is true, that this may involve a surrender of some part of the property, and placing it beyond the direct control of the trustees of the old corporation. But to dispose of property is to surrender it; and when it is Rone for an allowed purpose, this constitutes no objection* Upon the narrow view of this charter, that no property once acquired, could- be parted with, the church would be wholly disabled from providing for its own poor, and should the probable and desirable event occur, that it became too numerous to be accommodated in one congregation, those who should 'leave to form another church, must do so leaving all they had helped to accumulate behind; although their brethren should ever so strongly desire to set them up, with a just and reasonable outfit. This is a corporation, it is true, but we are never to forget that it was made for, and is composed of, natural persons, seeking their own spiritual welfare, and that of their fellow-men. And when those persons, to whom is committed the management and disposal of the property of the church, without fraud or unfairness, decide, that the best interests of all will be promoted, by using a part of that property in the establishment of a new organization to be composed of a part of the members of the old, we do not think it the duty of this court to interfere with such decision. We do, therefore, order and adjudge that the petition of the plaintiff stand dismissed; and, proceeding to adjudicate upon the cross-petition, we order it-to be certified as the opinion of this court, that the plan of sale and division of the church property, contained in the resolutions adopted by the corporation on the 23rd of May, 1859, involves no breach of trust, and is within the powers granted in the charter, and'we do authorize such sale and division to be carried into complete execution.
As this injunction was properly allowed when the petition *48 was filed, and has only become unnecessary by the subsequent action of the corporation, and as the adjudication upon the cross-petition is for the equal benefit of all, we order the costs of the action to be paid from the trust funds in the hands of the corporation.
Peck, C.J., and Brinkerhoef, J., concurred. Scott, J., dissented. Gholson, J., did not sit in the case.